| | | |
|---|---|---|
| TAMMIE FRALEY, et al. | * | HEALTH CARE ALTERNATIVE |
| | * | DISPUTE RESOLUTION OFFICE |
| Claimants, | | |
| | * | OF MARYLAND |
| v. | | |
| | * | HCA NO. 2018-370 |
| MERITUS MEDICAL CENTER, INC., et al. | | |
| | * | |
| Health Care Providers. | | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## CERTIFICATE OF MERITORIOUS DEFENSE
## OF ALLISON B. HABAS, M.D.

I, Allison B. Habas, M.D., state as follows:

1. I am a physician licensed in the State of California and am Board Certified in Internal Medicine.

2. I devote less than twenty percent (20%) of my professional activities annually to activities that directly involve testimony in personal injury claims.

3. I have had clinical experience in the field of internal medicine and as a hospitalist within five (5) years of the care and treatment at issue in the above-captioned case and am familiar with the medicine involved in this matter.

4. I have reviewed the pertinent medical records provided to me pertaining to this case.

5. Based on my background, education, experience and review of the medical records, it is my opinion to a reasonable degree of medical probability that Jessica Haynes claimed injuries and death were not proximately caused by any alleged

breach of the standards of care by Judith Njomo, M.D.; Dawit Wubie, M.D.; Chintu Sharma, M.D.; Brad Young, PA-C; and/or Sherry Baldassari, N.P.

6. My Report in connection with this claim is attached hereto.

_____
Allison B. Habas, M.D.

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 11th day of February 2019, a copy of the foregoing Certificate of Meritorious Defense and Expert Report of Allison Habas, M.D. was mailed first class, postage prepaid to:

Matthew A. Nace, Esq.
Barry J. Nace, Esq.
Paulson & Nace, PLLC
1025 Thomas Jefferson St., NW, Suite 810
Washington, DC 20007
*Attorneys for Claimants*

Larry A. Ceppos, Esq.
German A. Rodriguez, Esq.
Armstrong, Donohue, Ceppos, Vaughan & Rhoades, Chartered
204 Monroe Street, Suite 101
Rockville, Maryland 20805
*Attorneys for Meritus Medical Center, Inc. and Mohammed Bilgrami, M.D.*

Stephen M. Cornelius, Esq.
Eccleston & Wolf, P.C.
Baltimore-Washington Law Center, 4th Floor
7240 Parkway Drive
Hanover, Maryland 21076
*Attorneys for Vision Radiology*

Frederick W. Goundry, III, Esq.
Varner & Goundry, P.C.
121 E. Patrick Street
Frederick, Maryland 21701
*Attorneys for Associated Radiologists, PA, Gregory S. Zimmermann, M.D., Jennifer K. Flaim, DO, Narasim Murthy, M.D., and Paul C. Marinelli, M.D.*

/s/ Cathell

Natalie C. Magdeburger
nmagdeburger@pklaw.com
Telephone: (410) 339-5793
Facsimile: (410) 832-5691
Brian M. Cathell
bcathell@pklaw.com
Telephone: (410) 339-6771
Facsimile: (410) 832-5681
Pessin Katz Law, P.A.
901 Dulaney Valley Road, Suite 500
Towson, MD 21204
*Attorneys for Health Care Providers, Brad Young, M.D., Judith Njomo, M.D., Dawit Wubie, M.D., and Sherry Baldassari, N.P.*

3

Natalie Magdeburger, Esquire
Brian M. Cathell Esquire
Pessin Katz Law, P.A.
901 Dulaney Valley Road, Suite 400
Towson, Maryland 21204

*Re:   Tammy Fraley, et al v. Meritus Medical Center, Inc., et al*

Dear Ms. Magdeburger:

I have reviewed the medical records of Ms. Jessica Haynes ("Ms. Haynes") your office provided to me pertaining to this claim, as well as the Claimants' Statement of Claim and the Certificates of Qualified Expert and Reports by Dr. Robert Arbeit, Dr. Matthew Ammerman, Dr. Jerome Barakos, and Dr. David Goldstein. Based on my review of those materials and my background, training, and experience in internal medicine, it is my opinion to a reasonable degree of medical probability that Judith Njomo, M.D.; Dawit Wubie, M.D; Chintu Sharma, M.D.; Brad Young, PA-C; and Sherry Baldassari, N.P. (collectively the "Hospitalist Team") complied with the applicable standard of care in the care and treatment they provided to Ms. Haynes in June 2016.[1] Further, it is my opinion to a reasonable degree of medical probability that no alleged breach of the standard of care by the Hospitalist Team proximately caused or contributed to Ms. Haynes' claimed injuries or death.

On June 2, 2016, Ms. Haynes presented to the Berkeley Medical Center in Martinsburg, West Virginia with a two-day history of headache and a reported same-day episode numbness and heaviness in her right upper extremity. A CT scan was performed and interpreted to be normal. A lumbar puncture to further evaluate the headache was recommended to Ms. Haynes but, following a long discussion of the risks, benefits, and potential complications associated with a lumbar puncture, Ms. Haynes reportedly refused that procedure and was discharged home.

---

[1] Based on the records provided to me, it appears that Judith Njomo, M.D. and Dawit Wubie, M.D had no involvement in the care and treatment of Ms. Haynes and are simply listed in the medical chart. As such, there is no indication that either Dr. Njomo or Dr. Wubie owed a duty to Ms. Haynes. It is my opinion that neither Dr. Njomo nor Dr. Wubie breached any standard of care as it pertains to Ms. Haynes and that the care they rendered to Ms. Haynes had no causal connection to Ms. Haynes' alleged injuries and death.

On June 3, 2016, Ms. Haynes presented to the Berkeley Medical Center Emergency Department at 3:38 p.m. with an arrival complaint that she could not move her right side. Ms. Haynes left the Emergency Department without being seen and was reportedly taken by her family to the Meritus Medical Center in Hagerstown, Maryland.

On June 3, 2016 at 6:02 p.m., Ms. Haynes presented to the Meritus Medical Center with the stated complaint of "numbness right side." The triage notes indicate that Ms. Haynes complained of a four-day history of headache and the onset of right sided weakness at 8:00 a.m. that morning. Ms. Haynes was seen by Meagan Cooper, D.O., who documented right sided numbness and weakness and difficulty swallowing. The patient denied any fever, chills, nausea, vomiting, or diarrhea and her vital signs were within normal limits. Ms. Haynes' NIHSS score was an 8, with 4 (no movement) in the right arm. It was also noted in the records that Ms. Haynes demonstrated slurred speech and uneven pupils.

At 6:35 p.m. on June 3rd, Ms. Haynes underwent a CT scan. The results of that scan were read as being a normal examination of the head and neck with no evidence of intracranial hemorrhage. Hematology results from blood drawn at 7:01 p.m. on June 3, 2016 show a white blood cell count of 13.8 (4.1-10.2). Analysis of the patient's cerebrospinal fluid showed a white blood cell count of 725 (0-5) but no growth on the CSF culture with RBCs decreasing, which was attributed to a traumatic tap. Based on CSF analysis, Dr. Cooper opined that the patient's clinical presentation was more consistent with viral meningitis than bacterial meningitis. Dr. Cooper placed the patient for admission at 10:36 p.m. on June 3, 2016 with an admitting diagnosis of cerebrovascular accident ("CVA") and clinical impressions of 1) concern for CVA, and b) concern for viral meningitis.

Once admitted, the hospitalist team appropriately requested and relied upon specialty consultations by neurology, cardiology, hematology, and infectious disease as well as the interpretation of various imaging by radiology specialists.

On the morning of June 4th, Ms. Haynes underwent an MRI of the brain, which was interpreted by a radiologist as showing an acute ischemic infarction in the left brainstem. It was noted in the radiology records that there could be some petechial hemorrhage present due to susceptibility artifact and that a follow-up examination in 3-4 weeks would be appropriate.

Ms. Haynes was seen on June 4th for a neurology consultation by Dr. Samina Anwar. Dr. Anwar examined the patient and developed a plan to be followed by the

2

hospitalist team. Dr. Anwar opined that Ms. Hayne's diagnostic picture was suggestive of viral meningitis and continued her on antibiotic and antiviral medication. Dr. Anwar further indicated that given the patient's brain stem infarct, uncommon causes of stroke such as hypercoagulable state or cardiogenic source would need to be ruled out. Dr. Anwar ordered hypercoagulable screening, an echocardiogram, and an EEG for June 6th. Additionally, Dr. Anwar ordered a second MRI of the patient, which was completed on June 5th at 7:30 p.m. and was interpreted by radiologist Dr. Narasim Murthy as being a normal intracranial MRA. A third MRI of the patient was completed on June 6th at 5:00 p.m. and was interpreted by Dr. Jennifer Flaim as showing an increased area of restricted diffusion in the left brainstem with surrounding edema and mild thin rim enhancement, most suggestive of an evolving infarct with increasing edema and a few small areas of susceptibility suggesting a hemorrhagic component. Dr. Anwar followed Ms. Haynes throughout the course of her admission and provided ongoing neurological care of the patient.

On June 4th, Ms. Haynes was seen by Dr. Mohammed Bilgrami for an infectious disease consultation. Dr. Bilgrami noted that Ms. Haynes presented with a WBC count of 13.8 and that her cerebrospinal fluid showed white cells of 725, RBCs of 30, 65% neutrophils, and 35% mononuclear cells, 101 protein, and normal glucose. He noted that blood and CSF cultures had been obtained and that the patient had been given Acyclovir, Ampicillin, and Rocephin. Dr. Bilgrami noted that Ms. Haynes denied a history of flu-like symptoms, upper respiratory infection, cough, or cold. She denied any tick bite or rash, but indicated that she noticed a mosquito bite on her arm while at the zoo with her son a few days prior.

Following his examination of the patient, Dr. Bilgrami provided an infectious disease assessment and plan, which specified that Ms. Haynes' CSF was consistent with aseptic meningitis-like picture with 725 white cells and 101 protein, and he ruled out bacterial meningitis. Dr. Bilgrami noted that he was leaving Ms. Haynes on intravenous acyclovir until he could definitively rule out herpes simplex virus and on Rocephin until he could rule out Lyme disease. Dr. Bilgrami ordered an echocardiogram for Ms. Haynes and noted that he had consulted with neurology.

On June 5th, Ms. Haynes was seen by Dr. Elizabeth Konadu for a cardiology consultation. Dr. Konadu's note indicated that telemetry showed a sinus bradycardia with a heart rate typically in the 50s to 60s and it dropped to the 30s when asleep. Dr. Konadu noted that Ms. Haynes was known to have bradycardia, but that this was not of significant consequence. Dr. Konadu recommended transthoracic echocardiogram with bubble study to be done the next day to assess for a shunt and the administration of aspirin if not contraindicated but deferred to neurologist Dr. Anwar. The results of the

echocardiogram were notable for a left to right shunt with otherwise normal cardiac function and without evidence of obvious vegetation.

On June 10th, Ms. Haynes was referred by neurologist Dr. Anwar to Dr. Yong Tang for a hematology consultation. Dr. Tang noted that Ms. Haynes showed positive for antiphospholipid antibody and that he was highly suspicious for antiphospholipid syndrome. He ordered that a confirmation test needed to be completed after three months. Dr. Tang noted that he discussed the large size of the patient's stroke and the question of bleeding with neurologist Dr. Anwar and that the two the doctors decided to hold anticoagulation for two weeks.

In addition to receiving initial specialty consultations, Ms. Haynes was followed by these specialists throughout her stay at Meritus and their care is memorialized in her medical chart. Ms. Haynes' medical records indicate that her condition improved to where she was deemed viable for discharge to rehabilitation on June 8th. The records indicate that Ms. Haynes had no significant issues while a rehabilitation placement was being found. On June 16, 2016, Ms. Haynes was discharged for rehabilitation to War Memorial Hospital in Berkeley Springs, West Virginia. She was noted to be medically stable for discharge and was given discharge diagnoses of CVA, leukocytosis, and drug addiction in remission.

It is my opinion to a reasonable degree of medical probability that Ms. Haynes was appropriately evaluated, assessed and treated by the Hospitalist Team, that appropriate testing and consultations were ordered, and that the care and treatment rendered met the standard of care. Based on the information known to them, including Ms. Haynes' symptomology, past medical history, outcome of medical specialty consultations, imaging and laboratory studies, and the improvement in Ms. Haynes' condition during her admission, the Hospitalist Team acted reasonably and thoroughly in their care and treatment of Ms. Haynes. It is further my opinion that no alleged breach in the standards of care by the Hospitalist Team caused the injuries and death of Ms. Haynes.

As noted above I have reviewed the Plaintiffs' Certificates of Qualified Expert and Reports and I disagree with the opinions expressed therein to the extent they attest to departures from the standard of care by the Hospitalist Team and to the cause of Ms. Haynes' alleged injuries and death to the extent they are attributed to the Hospitalist Team.

In sum, based upon my knowledge, training, experience, and my review of the materials provided to me, it is my opinion that Judith Njomo, M.D.; Dawit Wubie, M.D; Chintu Sharma, M.D.; Brad Young, PA-C; and Sherry Baldassari, N.P. complied with all

4

applicable standards of care as it pertains to the care and treatment rendered to Ms. Haynes. Further, it is my opinion to a reasonable degree of medical probability that no alleged breached in the standard of care by Judith Njomo, M.D.; Dawit Wubie, M.D; Chintu Sharma, M.D.; Brad Young, PA-C; and Sherry Baldassari, N.P. proximately caused Ms. Haynes' alleged injuries and/or death.

This Report is meant as an overview of my opinions and is not intended to be a complete or expansive listing of every opinion I hold in this matter. I may supplement this Report as additional information becomes available. I hold all of my opinions in this case to a reasonable degree of medical probability.

Sincerely,

Allison Habas, M.D.

5

5.27.2020

*Via U.S. Mail*
Dr. Perry K. Richardson
GWU Medical Faculty Associates
Attn: Medical Records
900 23rd Street NW, St G2036
Washington, DC 20037

| | |
|---|---|
| **Date of Birth:** | 02/04/1970 |
| **S.S. # / M.R. #:** | xxx.xx.2048 |
| **Dates of Service:** | 02/01/2018 - Present |

Dear Records Custodian:

I would like to request a complete copy of my protected health information (PHI). This should include: **any and all chart notes, patient forms, reports, radiological imaging, and billings.** Please provide this information in electronic format as an Adobe Acrobat .pdf file (i.e. CD, DVD, thumb drive).

Please deliver the electronic information and any statement for the information charges to the following:

    **Paulson & Nace, PLLC**
    **1025 Thomas Jefferson Street, NW**
    **Suite 810**
    **Washington, DC 20007**
    Tele: (202) 463-1999
    Fax: (202) 223-6824

Thank you for your assistance.

Very truly yours,

_____
Patient Signature

John Czwartacki
Print Name



## IN THE HEALTHCARE ALTERNATIVE DISPUTE RESOLUTION OFFICE OF MARYLAND

| | |
|---|---|
| TAMMIE FRALEY, et al. | * |
| Claimants, | * |
| v. | *     CASE NO.: 2018-370 |
| MERITUS MEDICAL CENTER, INC., et al. | * |
| Health Care Providers. | * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF QUALIFIED EXPERT

Attorneys for Health Care Providers, Associated Radiologists, P.A., Gregory S. Zimmerman, M.D., Jennifer K. Flaim, D.O., Narasim Murthy, M.D., and Paul C. Marinelli, M.D., by and through the undersigned, submit the within Certificate of Qualified Expert signed by Susan G. O'Sullivan, M.D., in accordance with Section 3-2A-04 of the Health Claims Malpractice Claims Act, Courts and Judicial Proceedings Article, Annotated Code of Maryland as follows:

1. I am board certified in diagnostic radiology.

2. I have reviewed the Complaint, Certificates of Qualified Expert by Matthew Ammerman, M.D., Robert Arbeit, M.D., Jerome Barakos, M.D., and David Goldstein, M.D., and records and imagery of Meritus Medical Center regarding the Decedent Jessica Haynes.

3. I do not devote more than 20% of my time to activities that directly involve testimony in personal injury claims.

4.  Based upon my review of the records available to me stated above, it is my opinion to a reasonable degree of medical certainty that Health Care Providers, Associated Radiologists, P.A., Gregory S. Zimmerman, M.D., Jennifer K. Flaim, D.O., Narasim Murthy, M.D., and Paul C. Marinelli, M.D. did not violate the standard of care of medical care in their treatment of Jessica Haynes and that, therefore, they have a meritorious defense to the claim. Moreover, it is my opinion that nothing Health Care Providers, Associated Radiologists, P.A., Gregory S. Zimmerman, M.D., Jennifer K. Flaim, D.O., Narasim Murthy, M.D., and Paul C. Marinelli, M.D., did or did not do contributed to the death of Jessica Haynes.

_____
Susan G. O'Sullivan, M.D.

_____
Frederick W. Goundry, III
VARNER & GOUNDRY
A Professional Corporation
121 East Patrick Street
Frederick, Maryland 21701
(301) 631-1800
Attorneys for Health Care Providers,
Associated Radiologists, P.A.,
Gregory S. Zimmerman, M.D.,
Jennifer K. Flaim, D.O., Narasim Murthy, M.D.,
Paul C. Marinelli, M.D. and Elizabeth Konadu, M.D.

- 2 -

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 6th day of December 2018, a copy of the foregoing **Certificate of Qualified Expert** was sent via regular mail, postage pre-paid to:

Barry J. Nace, Esquire
Paulson & Nace, PLLC
1615 New Hampshire Avenue, N.W.
Washington, DC 20009

Larry A. Ceppos, Esquire
Armstrong, Donohue, Ceppos & Vaughn, Chtd.
204 Monroe Street, Suite 101
Rockville, MD 20850

Natalie C. Magdeburger, Esquire
Brian M. Cathell, Esquire
Pessin Katz Law, P.A.
901 Dulaney Valley Road
Suite 500
Towson, MD 21204

Stephen M. Cornelius, Esq.
ECCELSTON & WOLF, P.C.
Baltimore-Washington Law Center
7240 Parkway Dr., 4th Floor
Hanover, MD 21076

Chintu Sharma, M.D.
Adfintas Health
7250 Parkway Drive, Suite 500
Hanover, MD 21076

Frederick W. Goundry, III

Ed Goundry, Esq.
Varner & Goundry
121 East Patrick Street
Frederick, MD 21701

November 17, 2018

**Re:** Fraley v. Zimmermann, et al

**EXPERT REPORT**

1) Materials reviewed:

    ERCT/CTA Head and NECK—6/3/2016
    MRI Brain w and w/o contrast—6/4/2016
    MRA Brain—6/5/2016
    CT Head w/o contrast—6/4/2016
    MRI Brain w/ contrast—6/6/2016
    CT Head w/o contrast—6/15/2016

2) Standard of Care It is my opinion to a reasonable degree of medical certainty that the interpreting radiologists performed within the applicable standard of care. The initial interpreting radiologist, Dr. Gregory Zimmermann, performed a reasonable interpretation of the CTA Head and Neck on 6/3/2016. The subsequently diagnosed abnormality in the brainstem was nearly imperceptible on this initial study dedicated to evaluation of the vasculature. The given history for this exam was "right-sided numbness".
The patient underwent MRI of the brain on 6/4/2016 and final interpretation was provided by Dr. Paul Marinelli. Dr. Marinelli compared this study with the prior CTA of the Head. This study demonstrated a small area of restricted diffusion in the left brainstem on diffusion weighted images with hypointensity on the ADC map consistent with acute ischemia. Post-contrast images demonstrate mild subtle enhancement along the medial periphery of the abnormality and surrounding T2 hyperintensity consistent with edema, both of which can also be consistent with an acute infarct. Given the history of "history of right-sided weakness and numbness" the appropriate impression of acute ischemic infarction in the brainstem was put forth. This study was also preliminarily reviewed by a teleradiology service and Dr. Kalthia also described the abnormality and reasonably felt that findings were most compatible with ischemic infarct.
On 6/4/2016 a Head CT was performed with history "mental status change with bradycardia". This study was compared to the prior MRI of brain 6/4/2016. This study was interpreted by Dr. Marinelli. He reasonably interpreted an area of subtle low attenuation in the left

brainstem corresponding to the previously described infarct. There is no appreciable enhancement. On 6/5/2016 a MRA of the brain was performed and the lesion was imperceptible and correctly interpreted by Dr. Narasim Murthy, who compared this study with the prior Head and Neck CTA of 6/3/2016.

The patient then underwent follow-up MRI of the brain on 6/6/2016. The given history was "altered mental status". This study was interpreted by Dr. Jennifer Flaim who compared with the prior studies of 6/4/2016 and 6/3/2016. She accurately described the lesion in the left brainstem as having increased edema and more apparent rim of enhancement, and reasonably suggested this to be an evolving infarct.

Finally, a non-contrast Head CT was performed on 6/15/2016 which was interpreted by Dr. Gregory Zimmermann. The given history was "stroke". This study was compared with MRI brain 6/6/2016 and Head CT 6/4/2016. He reasonably interpreted the study as having an ovoid area of hypoattenuation in the left pons and adjacent edema which were unchanged compared with findings on the prior studies. The area of abnormality was reasonably felt to be similar to prior findings and consistent with given history of stroke.

3) Required Standard of Care

The standard of care requires an accurate description of the findings on each of the studies and comparison with available pertinent studies. Once the findings are described, the standard of care requires a reasonable impression of these findings and includes consideration of the given history. The standard of care requires communication of the findings and impression to the referring physicians.

4) Basis of conclusion

My conclusion above is based upon my education, training, continuing education, and 19 years of practice reading similar studies. My conclusion is based upon my own review of the studies and given clinical history, as well as years of practice with other radiologists and various bodies of literature.

5) Qualifications

I am board certified in Diagnostic Radiology with current licensure in Georgia and Virginia. I am currently practicing in a private hospital based practice in Brunswick, Georgia. I have been practicing for almost 20 years and have continued to maintain appropriate credentialing and licensing requirements in terms of continuing education and practice.

6) Opinion

It is my opinion that the interpreting radiologists including Drs. Zimmermann, Marinelli, Murthy, and Flaim were reasonable and practicing within the standard of care. This opinion is based primarily on the following:

1. All the imaging findings described in the imaging studies of the brain by the radiologists are compatible with findings of acute stroke and this conclusion was reasonable and appropriate, particularly given the provided history of "right sided weakness". Intracranial abscess is much less common than stroke and often is only suggested when a concordant history is put forth.

2. At least 4 different radiologists looked at several of these studies and all offered the same reasonable conclusion. This essentially defines the standard of care in that all 4 of these reasonable radiologists came to the same conclusion on multiple different studies.
3. Radiologists rely on the referring clinicians to provide an accurate and complete pertinent history, as they are the physicians in direct contact with the patient. If the clinicians were suspecting an abscess, then this should have been appropriately and promptly noted and/or the radiologist should have been contacted and specifically asked if the finding could represent an abscess. Clearly, based on the length of time that this possibility was not raised, the treating physicians believed that the imaging findings were consistent with the working history and physical exam.
4. The radiologist's role is not to provide an exhaustive differential diagnosis, as this is commonly not helpful to referring providers. The radiologist's role is to correlate the imaging findings with the history and come to the most reasonable conclusion. This conclusion is not meant for the referring provider to exclude other possibilities in the appropriate or evolving clinical setting.

7) Injuries
It is my opinion that the alleged injuries to this patient were not caused by the actions of the defendants because the interpretations were reasonable, appropriate, and timely. It is the responsibility of the clinicians providing direct care to the patient to integrate the radiology reports with the clinical findings and direct decision making accordingly.

These opinions are put forth within a reasonable degree of medical certainty based on my education, training, experience, and continuing education.

Susan G. O'Sullivan, M.D.